## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALEXANDRIA ELIAS, ROXANNE SCHER, DOLORES BAEZ and JENNIFER TOSI, on behalf of themselves and others similarly situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>UNGAR'S FOOD PRODUCTS, INC., d/b/a DR. PRAEGER'S SENSIBLE FOODS and SENSIBLE FOODS LLC d/b/a, DR. PRAGER'S SENSIBLE FOODS,<br><br>      Defendants. | Civil Action No. 2:06-cv-02448-KSH-PS |

---

## BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

---

SAIBER SCHLESINGER
SATZ & GOLDSTEIN, LLC
One Gateway Center, 13th Floor
Newark, New Jersey 07102
(973) 622-3333
Attorneys for Defendants

On The Brief:

David R. Gross, Esq.
James H. Gianninoto, Esq.
David A. Cohen, Esq.
Rina Grassotti, Esq.
Una Y. Kang, Esq.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT..............................................................1

STATEMENT OF FACTS ...................................................................3

LEGAL ARGUMENT ......................................................................17

I.    Plaintiffs Lack Standing as to Two of the Five Products.................17

II.   Plaintiffs Are Not Entitled To Class Certification ..........................17

      A.   Plaintiffs Cannot Meet the Requirements
           of Rule 23(b)(3)..................................................................18

           1. Proving The Causal Nexus Element of
              Plaintiffs' CFA Claim Would Involve
              Endless Individualized Issues ...........................................21

           2. Individual Issues Also Would Predominate With
              Respect to Ascertainable Loss ..........................................30

           3. Individual Issues Predominate As To Plaintiffs'
              Negligent Misrepresentation and Breach of Warranty
              Claims ........................................................................33

           4. Common Legal Issues Do Not Predominate Due
              to Conflicting State Laws...................................................35

III.  Plaintiffs Cannot Satisfy Requirements of Rule 23(a)....................40

      A.   Commonality................................................................40
      B.   Typicality ...................................................................40
      C.   Numerosity...................................................................41
      D.   Adequacy of Representation ...........................................41

CONCLUSION ..............................................................................44

# TABLE OF AUTHORITIES

## FEDERAL CASES

**PAGE**

Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997).........................................................18, 19

BMW of N. America V. Gore, 517 U.S. 559 (1996)...................................................................37

Baby Neal v. Casey, 43 F.3d 48 (3d Cir. 1994) .........................................................................18

Dal Ponte v. America Mortgage Express Corp., 2006 U.S. Dist. LEXIS 57675 (August 17, 2006 D.N.J.)........................................................................................................................39

East Tex. Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395 (1977) ...................................17

Feinstein v. Firestone Tire and Rubber Co., 535 F. Supp. 595 (S.D.N.Y. 1982)..........................43

In re Ford Motor Co. Ignition Switch Products Liability Litigation, 174 F.R.D. 332 (D.N.J. 1997) ....................................................................................................................19

In re Ford Motor Co. Ignition Switch  Products Liability Litigation, 1997 U.S. Dist. LEXIS 23996 (D.N.J. August 28, 1997) ........................................................................19, 31, 35

General Telegraph Co. of Southwest v. Falcon, 457 U.S. 147 (1982) ...........................................41

Georgine v. Amchem Products, Inc., 83 F.3d 610 (3d Cir. 1996)...................................................35

Hale v. Citibank, N.A., 198 F.R.D. 606 (S.D.N.Y. 2001)...............................................................43

Karmuth v. Rodale, Inc., 2005 U.S. Dist. LEXIS 14426 (E.D. Pa. July 18, 2005)................37, 38

Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941)......................................35

Oshana v. The Coca-Cola Co., 225 F.R.D. 575 (N.D. Ill. 2005) .............................................25, 30

In re Prudential Insurance Co. of America, 962 F. Supp. 450 (D.N.J. 1997)................................19

Sanders v. Johnson & Johnson, Inc., 2006 U.S. Dist. LEXIS 35881 (D.N.J. May 31, 2006).......................................................................................................................37, 38

Schnall v. Amboy National Bank, 2002 U.S. Dist. LEXIS 17879 (July 12, 2002).......................42

In re School Asbestos Litigation, 789 F.2d 996 (3d. Cir.), *cert. denied,* 479 U.S. 915 (1986).........................................................................................................................35

Solo v. Bed Bath & Beyond, Inc., 2007 U.S. Dist. LEXIS 31088 (D.N.J. 2007) .......................... 30

Stephenson v. Bell Atlantic Corp., 177 F.R.D. 279 (D.N.J. 1997) ................................................. 33

Thompson v. America Tobacco Co., 189 F.R.D. 544 (D. Minn. 1999) ......................................... 43

In re Universal Serv. Fund. Telegraph Billing Practices Litigation, 219 F.R.D. 661 (D.
Kan. 2004) .................................................................................................................................... 43

Warth v. Seldin, 422 U.S. 490 (1975) ........................................................................................... 17

Weiss v. York Hospital, 745 F.2d 786 (3d Cir. 1984) .................................................................. 41

## STATE CASES

Carroll v. Cellco Partnership, 313 N.J. Super. 488 (App. Div. 1998) ........................................... 22

Cellco, 313 N.J. Super. at 502-03 ............................................................................................ 29, 33

Cox v. Sears Roebuck & Co., 138 N.J. 2 (1994) .......................................................................... 21

Fink v. Ricoh Corp., 365 N.J. Super. 520 (Law Div. 2003) ........................... 19, 21, 25, 36, 38, 40

Folbaum v. Rexall Sundown, Inc., 2004 WL. 3574116 (App. Div. May 4, 2004) ....................... 29

Gantes v. Kason Corp., 145 N.J. 478 (1996) ............................................................................... 36

Gross v. Johnson & Johnson-Merck Consumer Pharms. Co., 303 N.J. Super. 336 (Law
Div. 1997) ..................................................................................................................................... 22

N.J. Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8 (App. Div. 2003) .................... 21

Rebish v. Great Gorge, 224 N.J. Super. 619 (App. Div. 1988) ..................................................... 42

Strain v. Nutri/System, Inc., 1990 WL. 209325 (E.D. Pa. Dec. 12, 1990) ................................... 27

Talalai v. Cooper Tire & Rubber Co., 360 N.J. Super. 547 (Law Div. 2001) .............................. 30

Thiedemann v. Mercedes-Benz, 183 N.J. 234 (2005) ............................................................. 21, 30

Veazy v. Doremus, 103 N.J. 244 (1986) ....................................................................................... 35

## DOCKETED CASES

Lamond v. PepsiCo, Inc., Civil Action No. 06-3043 (D.N.J. June 8, 2007) ................................. 34

iii

# FEDERAL STATUTES

Nutritional Labeling and Education Act of 1990, Pub. L. No. 101-535, 104 Stat. 2353 (1990), *codified as amended at* 21 U.S.C. §§ 301, 321, 337, 343, 371 .........................................7

Federal Rule of Civil Procedure 23......................................................................generally

# STATE STATUTES

New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq. ........................................................4, 20

## PRELIMINARY STATEMENT

Plaintiffs seek to certify a class, estimated to number "tens of thousands, perhaps more," consisting of all U.S. retail purchasers of five of defendants' products from May 30, 2000 to present. During that period, defendants sold a total of at least 40 different versions of the five different products, each of which contained different ingredients, used different recipes, and was packaged or labeled differently.

None of the named plaintiffs ever purchased two of the five products identified in the Amended Complaint – Tex-Mex Veggie Burgers or Potato Pancakes. Of the remaining three products none of the named plaintiffs ever purchased California Veggie Burgers prior to 2003 or the Broccoli or Spinach Pancakes prior to 2001. Moreover, no evidence exists to even suggest that any version of any of the five products produced before September 2005 or after May 2006 was mislabeled. Despite these irrefutable facts, plaintiffs propose a single nationwide class of all retail purchasers of the at least 40 different versions of the five different products sold from May 30, 2000 to present.

This case should not be certified as a class action because (1) the named plaintiffs lack standing to complain about two of the five products since they never purchased either of them; (2) individual questions of fact and law predominate over any questions common to the class; (3) class action treatment is not superior

to other available methods of adjudication; (4) this case is not manageable as a class action; (5) the named plaintiffs are not adequate class representatives and Troutman Sanders is not qualified to act as class counsel; and (6) denial of certification will not leave plaintiffs or other members of the proposed class without redress.

Despite plaintiffs' assertions to the contrary, the Court will need to determine numerous individual questions of fact and law, including, for <u>each</u> purchase of <u>each</u> version of <u>each</u> product actually purchased by each member of the proposed class:

- which version of what product was purchased;

- what the Nutrition Facts label on each package represented as to the fat and caloric content and whether those representations were accurate;

- whether each proposed class member actually read the Nutrition Facts label disclosures as to the fat and caloric content before each purchase;

- whether and the extent to which reasons other than the Nutrition Facts label disclosures as to fat and calorie content motivated the purchase;

- whether each member of the proposed class relied on the Nutrition Facts label disclosures as to the fat and/or caloric content to make the purchase;

- whether each proposed class member sustained an ascertainable loss due to the alleged mislabeling and, if so, the extent of such loss, including the actual price paid and benefits received;

- whether any ascertainable loss allegedly sustained by each proposed class member was proximately caused by the alleged mislabeling;

- the state(s) of residence and state(s) where each purchase was made;

- whether some or all of each proposed class members' claims are barred by the applicable statutes of limitation; and

- whether, and to what extent, applicable law allows for multiple or punitive damages or attorney's fees.

## STATEMENT OF FACTS

The Parties

Defendants Ungar's Food Products, Inc. and Sensible Foods LLC, d/b/a Dr. Praeger's Sensible Foods are family-owned and operated businesses, based in New Jersey and headed by two cardiac surgeons, Dr. Peter Praeger and Dr. Eric Somberg. The companies offer a line of all-natural frozen food products that are also kosher, low in sodium, cooked only in heart-healthy canola oil (*see, e.g.,* *Qualified Health Claims: Letter of Enforcement Discretion – Unsaturated Fatty Acids from Canola Oil and Reduced Risk of Coronary Heart Disease, at*

http://www.cfsan.fda.gov/~dms/qhccanol.htm, Ex. 1; *see also* Ex. 2, *Comparison of Dietary Fats* chart), free of trans-fats and preservatives, and free of, or low in, cholesterol and saturated fats. Plaintiffs' Amended Complaint alleges violations of the New Jersey Consumer Fraud Act (NJCFA), breach of warranty, and negligent misrepresentation in the marketing and sale of the five products that were allegedly mislabeled as to fat and caloric content. Plaintiffs allege that each member of the proposed class "reasonably relied" on the labeled fat and caloric content of the products and would not have purchased them if they had known of the alleged mislabeling. (Amended Complaint, ¶¶ 30 – 31, 53). The complaint expressly excludes all claims for personal injury and demands a trial by jury. *Id.* at ¶ 1.

Of the five products, plaintiffs purchased only three – the California Veggie Burgers, Broccoli Pancakes, and Spinach Pancakes. Of these three, the California Veggie Burger was first purchased in 2003 and the Spinach Pancakes and Broccoli Pancakes were first purchased in 2001. All of the plaintiffs are New York State residents, who made their purchases in New York or Maryland. None of the plaintiffs saw any advertisements for the products prior to their purchases.

Production and Label Changes

During the proposed class period, May 2000 to the present, defendants produced a total of at least 40 different versions of the five different products: 7 of the Broccoli Pancakes, 7 of the Spinach Pancakes and 13 of the California Veggie

Burgers, as well as, 6 of the Potato Pancakes and 7 of the Tex-Mex Veggie Burgers. (*See* Cohen Cert., Ex. 1 – 37). Each version contained different ingredients, mixed in different proportions, produced using different production methods and equipment, and packaged or labeled differently. *Id.*

For example, starting in about 2001, California Veggie Burgers contained egg whites. *Id.* at 6. Prior to 2002, Broccoli and Spinach Pancakes contained whole eggs in addition to egg whites. *Id.* at 1, 3. Starting in about 2002, egg whites were removed and arrowroot added to California Veggie Burgers. *Id.* at 6. Starting in about 2003, whole eggs were removed from Broccoli and Spinach Pancakes. *Id.* at 2, 4. Starting in about 2002 to about 2003, certain fresh ingredients were replaced with frozen ingredients. *Id.* at 15. In 2004 and again in 2005, incrementally larger capacity mixers and fryers were used. *Id.* In 2005, oat bran was replaced with potato flakes in Broccoli and Spinach Pancakes and arrowroot was removed. *Id.* at 2, 4. In 2006, all natural vegetable gum was added to California Veggie Burgers and Broccoli and Spinach Pancakes. *Id.* at 2, 5, 8. Between about April 2006 and July 2006, potato flakes were replaced with oat bran in Broccoli and Spinach Pancakes, and arrowroot was added. *Id.* at 3, 5. After about August 2006, oat fiber was added to Broccoli and Spinach Pancakes. *Id.*

Contrary to plaintiffs' assertions that Defendants made "uniform" or identical" representations during the proposed class period, the labeled fat and caloric content varied widely, as did the serving sizes. For example, California Veggie Burgers were sold in 78, 107, and 113 gram serving sizes and the labeling ranged from 92 to 160 calories and from 3.3 to 6.0 grams of fat per serving. *Id.* at 6 - 10. Spinach Pancakes were sold in 38 and 57 gram sizes and the labeling ranged from 40 to 80 calories and 2 to 4 grams of fat per serving. *Id.* at 3 – 6. Broccoli Pancakes were sold in 38 and 57 gram sizes with labeled values ranging from 40 to 70 calories and 2 to 3.5 grams of fat per serving. *Id.* at 1 - 3. The labeled values also varied widely for the two products never purchased by any of the named Plaintiffs: the Potato Pancakes ranged from 50 to 100 calories and 2 to 5 grams of fat per serving; and the Tex-Mex Veggie Burgers ranged from 100 to 110 calories and 3.3. to 4.5 grams of fat per serving. *Id.* at 11 - 15.

The FDA has never required that food manufacturers employ laboratory testing of food products to determine or verify the nutrient content. *See FDA Nutrition Labeling Manual - A Guide for Developing and Using Data Bases 1998 Edition at* http://www.cfsan.fda.gov/~dms/nutrguid.html. (Ex. 3). Prior to 2006, Defendants relied upon data from publicly available sources of nutrient information, including the United States Department of Agriculture National Nutrient Database for Standard Reference to calculate the nutrient content of their

products for the Nutrition Facts label required by the Nutritional Labeling and Education Act of 1990, Pub. L. No. 101-535, 104 Stat. 2353 (1990), *codified as amended at* 21 U.S.C. §§ 301, 321, 337, 343, 371.  Those calculations were based on the quantities of the various ingredients combined in each recipe for each version, as well as the quantity of the canola oil used to cook the products. (Ex. 4). That database provides a statistical average of the nutrient content of various ingredients and thus offers a more accurate measure of the natural variability of foods.  (*See* Ex. 3) and http://www.cfsan.fda.gov/~dms/nutrguid.html.  For fruits and vegetables, in particular, "variability may arise from seasonal and geographic influences associated with such factors as variety, location (e.g., soil type, climatic conditions); growing conditions (e.g., planting time, irrigation and fertilization practices, harvest maturity); product transport (e.g, packing, shipping, storage); and processing practices." *Id.* at 6.

Every laboratory test conducted for plaintiffs' counsel in 2006 is based upon single samples of product all produced after September 2005.  Tests conducted for compliance purposes, however, evaluate a composite of 12 sub-samples randomly selected from the same production lot since a single sample cannot account for the natural variability of the nutrients. *Id.* at 8.

In late 2005, one of defendants' competitors submitted a sample of California Veggie Burgers for laboratory analysis of its nutritional content.  When

the results purportedly showed a disparity from the labeled fat and caloric content, the competitor sent the results to the American Heart Association (AHA), which suspended permission for defendants to use the AHA checkmark it had previously been authorized to use on that product's packaging. Upon learning this, defendants promptly commenced an investigation into the cause of the disparity and by April 2006, determined that a combination of production and ingredient changes likely caused the product to absorb unanticipated residual amounts (a few grams per serving) of the canola oil used to cook the product.

While developing a solution, defendants issued a press release informing the public of the disparity, reached out to customers and retailers, and initiated a voluntary recall of certain versions of two of the products – California and Tex-Mex Veggie Burgers, under FDA supervision. Defendants then reformulated the products with all natural vegetable gum to limit the amount of canola oil absorbed during the cooking process, changed production methods and equipment to limit the amount of residual canola oil, and ordered new packaging and nutritional labels. In February 2007, the FDA advised Defendants that the matter was officially closed. (Ex. 37, to Cohen Cert., at 2).

The Proposed Class Representatives

Each plaintiff provided an extensive list of purely personal, individual reasons for purchasing the products, including:

- Recommendations
- Requests by family members
- Taste
- AHA checkmark
- All natural ingredients
- Fiber
- Low sodium
- Mood at the time of purchase

- No trans fats
- Canola Oil
- No artificial additives, preservatives, or colors
- No or low cholesterol or saturated fats
- Low carbohydrates
- The "Dear Valued Customer" message
- Dr. Praeger's photograph

*See* pp 9 – 15, *infra.* All of the plaintiffs acknowledge that they do not know whether the products they purchased actually contained more fat and calories than the label indicated. (Tosi Dep., Ex. 5 to Kang Dec., at 93:25 – 94:6; Scher Dep., Ex. 6 to Kang Dec., at 96:24 – 97:3, 98:11 – 23; 126:2 – 25; Elias Dep., Ex. 7 to Kang Dep., at 61:17 – 24; Baez Dep., Ex. 8 to Kang Dec., at 59:5 – 9, 71:6 – 10).

A.   Jennifer Tosi

Jennifer Tosi first purchased Broccoli Pancakes in 2001, based on a friend's recommendation. (Tosi Dep., Ex. 5 to Kang Dec., at 68:1 – 69:22; 77:15 – 20). She bought Spinach Pancakes shortly thereafter, because "we [Tosi and her family] liked the broccoli ones, figured we would try a new one", noting that she would not have bought the Spinach Pancakes if she did not like the taste of the Broccoli Pancakes. *Id.* at 92:20 – 24; 101:18 – 23. Tosi testified that, at first, she bought

one box of either product, "every month or two," but later reduced the frequency of her purchases to "maybe once every three months" only because her daughter, who had initially liked them very much "didn't like them quite as much so we didn't buy them as often". *Id.* at 91:19 – 25. She never purchased the California Veggie Burgers, Tex-Mex Veggie Burgers, or Potato Pancakes. *Id.* at 72:11 – 22; 81:5 – 10; 74:7 – 16. Tosi continued to purchase the Broccoli Pancakes and Spinach Pancakes even after she agreed to act as a named plaintiff in this suit. (*Id.* at 118:1 – 6; 124:7 – 13).

Tosi admits that she would have still purchased the products, despite any awareness of alleged mislabeling:

> Q:    What do you maintain are your monetary damages that you personally are seeking in this action?
>
> A:    Let's see. I mean, I think I would have still brought the product, I just may not have bought it as often or bought as many packages of it...

*Id.* at 118:1 – 6. When questioned why she continued purchasing and eating the products even after agreeing to participate in this lawsuit, she pointed to the "taste, relative healthiness" of the products. *Id.* at 124:7 – 13.

Having never seen defendants' website or any advertisements for defendants' products, Tosi admits she reviewed the packaging for the Broccoli

Pancakes and Spinach Pancakes only once, when she first purchased them in 2001. *Id.* at 74:17 – 21; 75:3 – 5.  However, when questioned, she first erroneously identified nutritional information on packaging that was not used for the Broccoli Pancakes until 2004 and later conceded that "[s]pecifically, no, I don't remember the nutritional information" on the package in 2001. *Id.* at 78:12 – 17.  After her initial purchases, she admits, she never reviewed the packaging or labels of either product again. *Id.* at 93:11 – 24.

B.   Roxanne Scher

Roxanne Scher first heard about the California Veggie Burgers from a friend, who told her "they were delicious" and provided a sample, which Scher liked the taste of. *Id.* at 62:5.  Scher testified that she first purchased the California Veggie Burgers based upon this recommendation. *Id.* at 65:16 – 20.  She admitted to replacing the Boca Burgers she had previously eaten with the California Veggie Burgers because she liked the taste enough to "eat the extra calories for the flavor." *Id.* at 64:12 – 24.  She never purchased Tex-Mex Veggie Burgers or Broccoli Pancakes or Potato Pancakes. *Id.* at 57:13 – 20.  Scher claims that she, her parents, or their housekeeper purchased California Veggie Burgers and Spinach Pancakes from September 2003 through May 2006.

Scher cited a variety of additional factors that influenced her purchases of the products. *Id.* at 112:6 – 9.  She found it "extremely important" that the

products contained all natural ingredients. *Id.* at 111:11 – 12; 112:1 - 5. She also noticed that the products were "low-carb" and did not contain whole eggs but egg whites, which she stated is something "I always look for". *Id.* at 114:3 – 5; 117:12 – 20; 118:21 – 25; 119:1 – 7. Scher also stated that when she first purchased the California Veggie Burgers, she "noticed" that they were low-cal and low-fat and when asked to explain what those terms meant to her, she testified that low meant to her less than 200 calories and that "4 grams of fat isn't a lot" *Id.* at 112:6-9. Scher also testified that Dr. Praeger's "Dear Valued Customer" message on the package had a "huge impact" on her decision to purchase the product the first time. *Id.* at 114:14 - 19. More specifically, Scher testified that she noticed "a picture of a doctor with a stethoscope and he – I remember distinctly that he was a cardiac surgeon so I was very happy that the product was endorsed by the American Heart Association and produced by a Doctor or who I believed was a Doctor, you know with a message saying that you should eat sensibly and if you're doing that you'll buy these products and that they are free of preservatives and artificial ingredients." *Id.* at 114:21-25, 115:1-6.

Scher testified that she visited defendants' website only once, in 2003, for the purpose of browsing the full product line. *Id.* at 73:20 – 75:15. She admitted that she could not recall the nutritional information listed on the website (if any was even listed at the time). *Id.* at 75:8 – 15. After her initial purchase of the

California Veggie Burgers and Spinach Pancakes, Scher did not review the packages in detail again, stating "I knew what I was buying. I'm sure occasionally I would read it" but "absolutely not" at the same level of examination as the first time. *Id.* at 73:1 – 25.

C.    Alexandria Elias

Elias first purchased California Veggie Burgers while looking for a meatless substitute to serve her family during Lent in March 2006. She testified that she "absolutely" purchased the product based upon the recommendation of two co-workers. *Id.* at 53:7 – 14; 54:4 – 19. She prepared the California Veggie Burgers by frying them in olive oil, contrary to the preparation instructions on the package which stated "[d]o not add any shortening." *Id.* at 56:19 – 24. (Cohen Cert. Ex. 20). Elias typically buys what her family requests and claims to have continued to purchase the California Veggie Burgers through May 2006 because her family liked the burgers and her husband asked her to buy them. *Id.* at 10:10 – 20; 56:5 – 11; 67:5 – 16. In total she purchased "at least" six packages of the product (Elias Interrog. Resp., Ex. 9 to Kang Dec., at ¶ 4), stopping only when Lent ended. (Elias Dep., Ex. 7 to Kang Dep., at 59:21 – 60:2). She never purchased the Tex-Mex Veggie Burgers or the Broccoli, Spinach, or Potato Pancakes. *Id.* at 50:21 – 51:1; 74:7 – 15. Elias never saw defendants' website or any advertisements for defendants' products and admits that she "probably never" reviewed the packaging

for the California Veggie Burgers after her initial purchase. *Id.* at 57:23 – 58:8; 80:14 – 24; 81:19 – 25.

D.    Dolores Baez

In April 2006, Baez went to Costco, looking for the 60-oz. "club size" package of California Veggie Burgers containing sixteen 107-gram patties, because of the enthusiastic recommendations she received from friends and acquaintances. (Baez Interrog. Resp., Ex. 10 to Kang Dec., at ¶ 4; Baez Dep., Ex. 8 to Kang Dec., at 53:4 – 24). She never purchased the Tex-Mex Veggie Burgers or the Broccoli, Spinach, or Potato Pancakes. *Id.* at 47:18 – 20; 47:21 – 24. Suffering from hypertension and having undergone open heart surgery in 2001, Baez testified that her doctor had recommended a low-sodium diet and she also looks for products containing oat bran. *Id.* at 17:23 – 18:24; 19:25; 20:1 – 5; 60:23 – 25; 61:1 – 2; 61:11 – 13. Baez also attributed her purchase to Dr. Praeger's "Dear Valued Customer" message and Dr. Praeger's photograph on the back of the box, since he was a cardiac surgeon and "would be more conscious of what was healthy for someone who had heart problems like myself." *Id.* at 61:16 – 62:5. Baez never bought the product again because she did not like the taste. *Id.* at 58:9 – 18. She gave the unused portion to her grandson, who "really liked them". *Id.* at 59:1 – 4.

E.    Plaintiffs' Recruitment in This Class Action

Each of the four named Plaintiffs become involved in this lawsuit only at the suggestion or direction of a relative or friend employed by class counsel. Baez, for example, testified that she retained Troutman Sanders when her daughter-in-law – a secretary at the firm – suggested she call the firm about the lawsuit. *Id.* at 56:9 – 15. Discovery also revealed that class counsel informed Baez that she would never be responsible for the expenses or disbursements incurred in prosecuting this case. *Id.* at 74:12 – 20.

Tosi learned about the alleged mislabeling from a friend employed at Troutman, who suggested that she call Troutman attorney Matt Aaronson "for more information". (Tosi Dep., Ex. 5 to Kang Dec., at 109:4 – 11; 110:14 – 16; 111:6 – 22). Elias retained Troutman at the suggestion of her friend, another Troutman employee. (Elias Dep., Ex. 7 to Kang Dep., at 63:12 – 25).

Finally, Scher is represented by the same firm where her mother is a partner in the same practice group as class counsel. Her mother told her to speak to other attorneys at her firm. Scher Dep., Ex. 6 to Kang Dec., at 87:2 – 8. Scher's mother's partner Charles Greenman and associate Matt Aaronson called Scher "fairly soon afterwards". *Id.* at 103:9 – 25. She also testified that she was well acquainted with those attorneys in particular, prior to the lawsuit, saying: "I've known him [Mr. Greenman] my entire life" and admitting that she knew of Mr.

Aaronson, through his "…working with her [Scher's mother] very closely for a very long time". *Id.* at 134:1 – 9. Scher also testified regarding whose idea it was to initiate the lawsuit:

Q:   "Who came up with the idea to initiate the lawsuit, you

or your mother?"

* * *

A:   "It wasn't me".

*Id.* at 96:7 – 8; 19.

## LEGAL ARGUMENT

### I.    Plaintiffs Lack Standing as to Two of the Five Products

As a preliminary matter, the named plaintiffs lack standing to represent the proposed class with regard to two of the five products referenced in the Amended Complaint.   It is axiomatic that class representatives must be members of the subclasses they seek to represent, meaning they must "possess the same interest and suffer the same injury as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977).   Plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975).   It is undisputed that the named plaintiffs never purchased defendants' Tex-Mex Veggie Burgers or Potato Pancakes.  Because they cannot allege or prove that they have personally suffered damages by purchasing those two products, the named plaintiffs cannot be said to have the same interest and suffer the same injury as the proposed class members whom they seek to represent.   Therefore, plaintiffs lack standing to pursue any claims for the two products they never bought.

### II.   Plaintiffs Are Not Entitled To Class Certification

A party seeking to certify a class must not only meet all four criteria of Federal Rule of Civil Procedure 23(a), which requires:  (1) numerosity -- a "class

[so large] that joinder of all members is impracticable;" (2) commonality - - "questions of law or fact common to the class;" (3) typicality -- named parties' claims or defenses "are typical . . . of the class;" and (4) adequacy of representation -- representatives "will fairly and adequately protect the interests of the class," but plaintiffs must also show that the action is maintainable under one of the three subsections of Rule 23(b). *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615 (1997); *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir. 1994). Here, plaintiffs assert that they have satisfied the four general requirements of Rule 23(a), but rest their argument exclusively on Rule 23(b)(3). Because fulfillment of the more general elements of Rule 23(a) turns on fulfillment of the more stringent requirements of Rule 23(b)(3), the following legal discussion will focus primarily upon plaintiffs' failure to meet the requirements of Rule 23(b)(3).

### A.    Plaintiffs Cannot Meet the Requirements of Rule 23(b)(3)

Rule 23(b)(3) requires that (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members ("predominance") and (2) class-wide adjudication be superior to other available methods for the fair and efficient adjudication of the controversy ("superiority"). The predominance requirement, designed to ensure that a class is sufficiently cohesive to warrant certification, calls for an assessment of whether the efficiencies in resolving the common issues together are outweighed by the

individual issues presented for adjudication. *Amchem,* 521 U.S. at 623; *In re Prudential Ins. Co. of Am.,* 962 F. Supp. 450, 511 (D.N.J. 1997). The court must determine whether there are significant individual questions with respect to "each class member's cause of action or to the defense of such claims." *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 174 F.R.D. 332, 340 (D.N.J. 1997) In making that determination, the Court may evaluate: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the difficulties likely to be encountered in the management of a class action. *Amchem,* 521 U.S. at 615-16. Any individual issues "must be of lesser overall significance and they must be manageable in a single class action." *Ford,* 174 F.R.D. at 340.

Rule 23(b)(3)'s superiority requirement involves consideration as to whether (1) alternative available methods of adjudication exist for each issue, (2) all interests will be fairly represented in the selected forum, and (3) the various methods of adjudication will be efficient. *See Fink v. Ricoh Corp.,* 365 N.J. Super. 520, 599 (Law Div. 2003). It is plaintiffs' burden to devise a "workable plan for

trial embracing all claims and defenses." *In re Ford Motor Co. Ignition Switch Products Liability Litig.,* 1997 U.S. Dist. Lexis 23996 at *53 (D.N.J. August 28, 1997). Without a realistic trial plan, the "case would quickly devolve into an unmanageable morass of divergent legal and factual issues." *Id.* at *59-60.

The Amended Complaint alleges violations of the New Jersey Consumer Fraud Act (NJCFA), negligent misrepresentation and breach of warranty. (*See generally,* Amended Complaint). Purporting to satisfy Rule 23(b)(3), plaintiffs recite the Rule's requirements in a mechanical fashion and summarily conclude that they meet those requirements. However, it is abundantly clear that the numerous individual questions inherent in the claims predominate over any common issues, making class action adjudication inferior to any alternative means to fairly and efficiently adjudicate the controversy.

First, the NJCFA's causation requirement cannot be proven without a highly fact-intensive examination of the subjective mental process of every single class member in purchasing defendants' products, including such individualized considerations as taste, dietary preferences and recommendations. Second, the ascertainable loss requirement of the CFA claim cannot be proven on a class-wide basis because it would require conducting individualized examinations to determine what each class member believed they were purchasing and whether they received something other than what they expected, further complicated by the

fact that at least 40 different versions of the five different products with different labels were sold during the proposed class period. Third, individualized questions are inherent in the proofs required to establish the reliance element of plaintiffs' negligent misrepresentation claim, as well as the benefit-of-the-bargain element of plaintiffs' breach of warranty claim. Fourth, as this action implicates the laws of fifty-one different jurisdictions (fifty states plus D.C.), the conflicts of law presented make class-wide adjudication untenable.

## 1. Proving The Causal Nexus Element of Plaintiffs' CFA Claim Would Involve Endless Individualized Issues.

In order to prove a claim under the NJCFA, a private plaintiff must demonstrate (1) unlawful conduct by the defendant (2) an ascertainable loss on the part of the plaintiff and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss. *N.J. Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 12-13 (App. Div. 2003) (*citing Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 24 (1994)).

The causal nexus element requires a plaintiff to establish that the alleged ascertainable loss was suffered "as a result of" or "attributable to" defendant's unlawful conduct. *N.J.S.A.* § 56:8-19; *see also Thiedemann v. Mercedes-Benz*, 183 N.J. 234, 246 (2005). The NJCFA requires that "there must be some 'direct relation' between the unlawful conduct and the injury asserted." *Fink*, 365 N.J. Super. at 574 (*citing Int. State Bank v. Veglia*, 286 N.J. Super. 164, 179-80 (App.

Div. 1995), *certif. denied,* 144 N.J. 377 (1996)).  Although the NJCFA itself does not require an individual plaintiff to prove reliance, where class certification is sought, "plaintiffs must be able to prove individual reliance ... [in order] to demonstrate that common law issues predominate over individual issues." *Carroll v. Cellco Partnership,* 313 N.J. Super. 488, 499 (App. Div. 1998).  Moreover, here, the Amended Complaint specifically alleges that plaintiffs relied upon the fat and caloric values listed on the product labels. (*See* Amended Complaint, ¶¶ 30, 53). Therefore, plaintiffs cannot avoid their inability to demonstrate reliance on a class-wide basis (or even on an individual basis), as it is an essential element of their negligent misrepresentation claims. (*See* § C *infra*, pp. 32-36).

New Jersey courts have recognized the enormous difficulties with class certification in consumer fraud cases, and in particular, the individualized issues involved in proving causation.  In *Gross v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 303 N.J. Super. 336, 346 (Law Div. 1997), purchasers of Pepcid AC, a heartburn and acid indigestion relief product, alleged that the manufacturer falsely represented that 8 out of 10 doctors and pharmacists chose Pepcid AC over Tagamet HB, that Pepcid AC works for 9 hours all day or night and that only Pepcid AC had proven ability to prevent heartburn and indigestion.  In denying class certification, the *Gross* court recognized the presence of some common issues but found that they were subsumed by the highly individualized questions such as

(1) whether each plaintiff saw the advertisements at issue; (2) whether each plaintiff relied on those advertisements in choosing to purchase the product; and (3) whether each plaintiff suffered an ascertainable loss as a result of the purchase. *See id.* at 334-43.   Rejecting plaintiffs' argument that the alleged misrepresentations were uniform, the court explained that in order to prove damages, each class member would have to answer individualized questions as to what advertisement he or she had seen and whether or not they would have purchased the product "but for" the particular advertisements. *Id.* at 349-50.

The court explained that "[a] brief sampling of the deposition testimony of the representative class members . . . illuminates the enormous difficulties that will be encountered in attempting to establish the elements of reliance, ascertainable loss or injury for plaintiff's claims." *Id.*  One plaintiff purchased Pepcid AC on recommendations from friends and vaguely recalled seeing TV commercials, while another plaintiff based her decision on a commercial that said she could avoid heartburn if she took Pepcid AC 20 minutes before a meal. *See id.* at 345-46.  Yet another plaintiff recalled an ad that boasted "'something like nine out of ten doctors recommend [Pepcid].'" *Id.* at 346.

The same problems are manifest here.  Since as many as 40 different versions of the 5 different and differently labeled products were sold, the representations at issue are far from uniform.  Moreover, the four named plaintiffs

have given, in deposition, widely varying personal reasons for purchasing defendants' products:

- Elias listed almost a dozen different reasons that influenced her decision to purchase, but the caloric and/or fat content listed on the label was not one of them.

- Both Baez and Tosi testified that one of the reasons they purchased defendants' products was because they did not contain trans or saturated fats, but neither said that they considered the caloric content or the *total* fat content -- the figures alleged to have been inaccurate in this case.

- All four of the named plaintiffs testified that taste was critically important in their decision to purchase defendants' products and that they would not have continued to purchase them if they did not like the taste.

- Scher testified to having many personal reasons for purchasing the products, including that she "noticed" that it was a low fat and low calorie food; Scher further testified that "to her" a product containing less than 200 calories per serving was a low-calorie food and that 4 grams in "not a lot of fat." (Scher Dep., Ex. 6 to Kang Dec., at 112:6 – 9).

In short, there is no common causal nexus connecting each plaintiff's purchase to the alleged mislabeling. A fact-finding exercise would have to be conducted for every proposed class member to explore individual preferences and thought-processes in the purchase of the products. Proving NJCFA causation on a case-wide basis is simply impossible. Plaintiffs make no attempt to explain, other than in purely conclusory terms, how class adjudication possibly can be superior to alternative available methods. *See Oshana v. The Coca-Cola Co.*, 225 F.R.D. 575, 587 (N.D. Ill. 2005) (a class action is "not a superior method of adjudication when extensive individualized proceedings to determine causation, damages and reliance are unavoidable").

Moreover, as part of plaintiffs' burden to show that each class member would not have purchased the product "but for" the fat and caloric values on the labels, plaintiffs must necessarily demonstrate that **each** class member actually read the label **and** purchased the product "as a result of" that information. *See Fink*, 365 N.J. Super. at 545 (plaintiffs must show that "each class member read one or more of the advertisements upon which plaintiffs rely and that ... [it] constituted a proximate cause of an ascertainable loss of money or property.") Further, because the products in this action include 40 different versions of five different products each of which was packaged or labeled differently, plaintiffs would have to make this showing as to **each** purchase made by each class member.

A cursory review of the deposition testimony in this case shows that even the named plaintiffs could not recall with any clarity what information on the box they read, if any, or what data was represented. In fact, three of the four named plaintiffs believed that they looked at the nutritional data on defendants' products only upon their first purchase, and never reviewed that data upon subsequent purchases. For instance, Tosi testified that after her initial purchases she never reviewed the packaging or labels of the products again (Tosi Dep., Ex. 5 to Kang Dec., at 93:11-24); Sher testified that after her initial purchase of the California Veggie Burgers and Spinach Pancakes, she did not review the packages again, although she speculated that she could have reviewed the labels thereafter, but not to the same level of scrutiny (Scher Dep., Ex. 6 to Kang Dec., at 73:2-11); and Elias admitted that she "probably never" reviewed the packaging for California Veggie Burgers after her initial purchase. (Elias Dep., Ex. 7 to Kang Dec., at 57:23-58:8).

Instead of offering a workable plan, or any plan at all, plaintiffs summarily assert that "no insurmountable difficulties are likely to be encountered in the management of this litigation." (Pb at 22). This bare assurance is completely insufficient to explain how causation can be established on a class-wide basis where there are 40 different versions of five different products at issue, each of which was packaged or labeled differently during the proposed class period.

Simply put, plaintiffs can hardly establish that they even read the nutritional data the first time they purchased the product, and as such, they certainly cannot establish which one of the 40 versions they purchased let alone the representations listed on the label.

In a similar setting, in *Strain v. Nutri/System, Inc.*, 1990 WL 209325 (E.D. Pa. Dec. 12, 1990), the District Court denied class certification where plaintiffs alleged that defendant misrepresented the results of its weight loss program in nationwide advertisements, but could not identify common issues of causation or reliance. *Id.* at *8. The *Strain* court was troubled by the fact that "the proposed class consisted of all individuals who joined Nutri/System, ... [because] [i]mplied in that class definition ... is the conclusory assumption that everyone who joined did so in reliance on the advertising." *Id.* at *6. The court held the fact that an individual signed up for the Nutri/System Program "not to be evidence that she was induced to do so by the allegedly fraudulent misrepresentation." *Id.*

> [S]atisfaction of the reliance issue, requires each class member to narrate a story which includes individualized proof of which advertisements he saw and whether they indeed enrolled in reliance of those advertisements. There are no shortcuts. The proposed class may include individuals who joined Nutri/System's upon the recommendation of a friend or for some other personal reasons. Lacking in this case is a single set of operative facts that can be applied on a class wide basis...

*Id.* at *6.

Similarly, here, it cannot fairly be assumed that everyone who purchased defendants' products did so in reliance on the specific fat and caloric values printed on the box. In fact, even the named plaintiffs conceded they purchased the products "upon the recommendation of a friend or for some other personal reasons," *id.*, and not because of the information contained on the label:

- All four of the named plaintiffs testified that they purchased defendants' products based upon recommendations.

- Tosi testified that she purchased the products because her family enjoyed the taste.

- Baez testified that she purchased defendants' product because it was low in sodium, which her doctor had recommended for her diet, and it was recommended by her fellow members at Weight Watchers.

- Elias testified that she purchased defendants' product largely because she was limited to consuming meatless products during Lent and her husband requested she buy them.

- Two of the named plaintiffs testified that Dr. Praeger's picture and "Dear Valued Customer" message were a significant influence in their purchases.

In an effort to gloss over the individualized nature of their claims, plaintiffs now claim -- for the first time -- that the common reason for their purchases was that they perceived defendants' products to be healthy.    (Pb at 2-5, 17) ("Defendants promote their Products almost entirely on the basis of their health benefits, barely mentioning anything else").    However, the gravamen of the Amended Complaint is the specific fat and caloric values represented on the labels – not an elusive concept of healthiness. (*See* Amended Complaint, ¶¶ 24-28).    In any event, determining what a consumer believes is healthy would require yet another complicated layer of individualized exploration into why each class member purchased the products. *See also Cellco,* 313 N.J. Super. at 502-03 (denying class certification because plaintiffs would have to "prove how [common] representations or omissions impacted upon each plaintiff, that is, how plaintiffs were induced to purchase defendants' services").

The deposition testimony here richly demonstrates why a class action would be inferior to other methods of adjudication:  establishing the necessary casual link would require each of the "tens of thousands" of class members to narrate their individual stories regarding which version of which product they purchased, and whether they made their purchases as a result of the fat and caloric values listed on the box or an unlimited list of other personal reasons. *See id.; see also Folbaum v. Rexall Sundown, Inc.,* 2004 WL 3574116 (App. Div. May 4, 2004) (reversing class

certification of NJCFA deceptive labeling suit because "[i]n order to sort which customers suffered a loss and which did not, an individual evaluation of each claimant would have to be undertaken ... explor[ing] the mental processes of each class member"); *Oshana*, 225 F.R.D. at 580 (denying class certification in consumer fraud action because "an identifiable class does not exist if membership is contingent upon a particular state of mind.") *Id.* at 580.

## 2. Individual Issues Also Would Predominate With Respect to Ascertainable Loss.

For like reasons, individual issues as to "ascertainable loss" also predominate here. Defined as "a cognizable and calculable claim of loss due to the alleged NJCFA violation," an ascertainable loss generally involves a showing that the consumer has received something other than what he bargained for, resulting in a loss of money or property. *See Thiedemann*, 183 N.J. at 248-49; *Talalai v. Cooper Tire & Rubber Co.*, 360 N.J. Super. 547, 564 (Law Div. 2001). Therefore, the consumer must demonstrate the nature of the item she believed she was purchasing, i.e., what she believed she "bargained for," **and** also that she actually received was "something other than" what she believed she bought. *See, e.g., Solo v. Bed Bath & Beyond, Inc.*, 2007 U.S. Dist. Lexis 31088, 5-13 (D.N.J. 2007) (in NJCFA suit alleging that defendant misrepresented bed sheet thread count, plaintiff's "broad and conclusory" statement that class members purchased linens "of a lower quality and less valuable than the linens they were promised,"

insufficient to demonstrate ascertainable loss under the NJCFA)   Both of these queries are highly fact-sensitive and would necessitate countless "mini-trials" if a class was to be certified.

The New Jersey District Court denied class certification in a closely analogous case involving allegedly defective vehicle ignition switches. *See Ford,* 1997 U.S. Dist. Lexis 23996.   First, in rejecting plaintiffs' contention that the switches were uniformly defective, the court explained that the switch malfunction was dependent upon various factors, including car model, model year and the conduct of the vehicle's operator. *Id.*  A "general similarity" between the switches of different models did not mean that if a particular model's switches were defective, then all models' switches were defective. *See id.* at *32. The court held, "[i]t is principally the need for individualized determinations spanning 158 potential subclasses of model years that undermines factual issue predominance." *Id.* at *33-34.

So too here, each class member's claim is dependent upon whether each of as many as 40 different versions of the five different products was inaccurately labeled.   Contrary to plaintiffs' argument that "[t]he class's claims arise from a single course of conduct," each class member's claim is dependent upon whether the actual food product purchased contained an amount of fat and calories greater than the amounts allowed by the FDA. (Pb 17).   Defendants produced at least

seven different versions each of the Broccoli and the Spinach Pancakes, and thirteen of the California Veggie Burgers during the proposed class period. In keeping with the *Ford* reasoning, mislabeling of some packages of some versions of some products does not justify the conclusion urged by proposed class counsel that all versions of all products were mislabeled.

Even in the absence of those variants over the years, ascertainable loss cannot be determined on a class-wide basis due to the lack of proofs. Plaintiffs have yet to explain how they intend to prove that each class member purchased a product that was inaccurately labeled when even the named plaintiffs admittedly have not kept product, receipts, packaging or other evidence of their purchase of the products they actually bought. Plaintiffs offer only their hazy memories of grocery purchases made over a seven-year period.

Individualized questions also need to be answered in order to resolve defendants' affirmative defenses, such as whether plaintiffs mitigated their damages. Tosi testified that she continued to purchase defendants' products even after she learned of the mislabeling allegations. Elias testified that she prepared her veggie burgers in olive oil, conduct seemingly inconsistent with a concern about fat or caloric content. These are just a few examples of the individualized questions of fact involved in resolving defendants' affirmative defenses as to just the four named plaintiffs – let alone an entire class.

Resolution of defendants' statute of limitations defense would also involve individualized issues.   To the extent that plaintiffs seek to certify a nationwide class consisting of purchasers over a seven-year period commencing in 2000, each of the class members' purchases would have to be examined pursuant to the applicable statutes of limitations, depending on the jurisdiction, for each cause of action discussed further in § D, *infra*.

### 3.   Individual Issues Predominate As To Plaintiffs' Negligent Misrepresentation and Breach of Warranty Claims

The proofs needed to demonstrate plaintiffs' negligent misrepresentation and breach of warranty claims are inherently individualized.    A fact-finding examination would need to be conducted to determine whether each class member relied upon the complained-of representations.    Indeed, plaintiffs' negligent misrepresentation claim carries with it an even more stringent standard of proof that the NJCFA claim and thus requires rigorous fact-sensitive, individualized inquiries. *See Cellco,* 313 N.J. Super. at 503 ("[t]he same obstacles face plaintiffs on their negligent misrepresentation claim," as the three class representatives all exhibited "different degrees of reliance"); *see also Stephenson v. Bell Atlantic Corp.,* 177 F.R.D. 279, 294 (D.N.J. 1997) (where "the named plaintiffs themselves have offered testimony showing the individual nature of the reliance issues, ... the

issue of whether the fraudulent misrepresentations made a difference in causing harm will likely require a degree of individualized fact-finding").

The same is true for plaintiffs' breach of warranty claims. Baez testified that she did not care for the taste of defendants' products so she gave them to her son and daughter-in-law.   Scher, however, consumed and enjoyed the taste of defendants' products for years. Tosi, on the other hand, continued to purchase the products even after she learned of the alleged inaccurate labeling. Since plaintiffs consumed the products, each of them arguably received *some* benefit from their consumption.   These facts bear directly on defendants' affirmative defense that plaintiffs received the benefit of their bargain. *See Lamond v. PepsiCo, Inc.,* Civil Action No. 06-3043 (D.N.J. June 8, 2007) (the "parties must recognize that there was at least some value to the beverage"). Even this small sampling of testimony makes it apparent that whether each class member received the benefit of their bargain is truly an individualized question.

Plaintiffs' suggestion that damages can be assessed on a class-wide basis ignores these individual issues and fails to account for variations of different states' laws. *See id.* ("[w]hile [p]laintiff may indeed be asking for a 'refund, the law governing the claim at issue makes clear that the amount one is entitled to equals the amount paid for the product <u>less</u> the value of the product received.") (footnote omitted) (emphasis in original).

### 4. Common Legal Issues Do Not Predominate Due to Conflicting State Laws

Differences in state law, no matter how slight, must be determined prior to certification because they "may swamp any common issues and defeat predominance." *Ford,* 1997 U.S. Dist. Lexis at *17; *see also Georgine,* 83 F.3d at 618 (the "radically different factual and legal issues" raised by each individual plaintiff's claim, "when exponentially magnified by choice of law considerations, eclipse any common issues in this case"). Certification of a nationwide class in which the consumer fraud law of the 50 states, rather than federal law, must be identified and applied, "places the burden upon plaintiffs to credibly demonstrate, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles." *Id.*; *see also In re School Asbestos Litig.,* 789 F.2d 996, 1010 (3d. Cir.), *cert. denied,* 479 U.S. 915 (1986).

When exercising diversity jurisdiction, this court must determine which state's law to apply by looking to New Jersey law governing choice-of-law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496 (1941). New Jersey requires a governmental interest analysis, whereby the court must first determine whether a conflict exists between the laws of the interested states. *See Veazy v. Doremus,* 103 N.J. 244, 248 (1986). Where a conflict exists, the court must compare the competing interests of the states whose laws may potentially apply to

ascertain which state has the greatest interest in having its law applied. *See Gantes v. Kason Corp.,* 145 N.J. 478 (1996).

As recounted in *Fink v. Ricoh Corp.*, 365 N.J. Super 520 (Law Div. 2003), a decision which provides a comprehensive analysis of the various states' consumer fraud laws, there are "numerous actual conflicts between the different states' consumer fraud statutes":

- Some states, namely Montana, South Carolina, and Alabama, completely bar private class action consumer fraud lawsuits. *See id.* at 570-71.

- The NJCFA affords plaintiffs the right to a jury trial, but the same is not true for plaintiffs in Illinois, Massachusetts and Connecticut. *See id.* at 573.

- New Jersey and Nevada mandate treble damages; in Tennessee and Pennsylvania, the award of treble damages is discretionary; and some states, such as Iowa and Wisconsin, make no provision for treble damages or even common law punitive damages. *See id.* at 579.

- Some states, such as New Jersey, Maine and Wisconsin, mandate the award of attorneys' fees to successful plaintiffs, but in other states, like Montana, Oregon and Kansas, the award of attorneys' fees is discretionary. *See id.* at 583-84.

{00489373.DOC}

- Wide disparities also exist regarding plaintiffs' negligent misrepresentation and breach of warranty claims. *See Sanders v. Johnson & Johnson, Inc.*, 2006 U.S. Dist. Lexis 35881 at *15-16 (D.N.J. May 31, 2006) (recognizing that states often "provide different formulations concerning negligence and its related concepts, and at least in some circumstances, those differences can be important" and states also differ on their requirements for establishing a breach of warranty claim).

- Disparities also exist regarding the elements of proximate cause, reliance and scienter. *See id.* at 573-79.

These kinds of conflicts have led courts to express an almost "universal reluctance" to certify national class actions because distilling the laws of fifty states is an "impossibly difficult task." *Karmuth v. Rodale, Inc.,* 2005 U.S. Dist. Lexis 14426 at *13 (E.D. Pa. July 18, 2005)

Plaintiffs completely ignore the glaring variations among the states' consumer protection laws, and provide only a superficial discussion on the choice of law issue. This fact alone warrants denial of certification. *Id* at *14. (*citing BMW of N. Am. V. Gore,* 517 U.S. 559, 568-69 (1996) (class certification should be denied where plaintiffs fail to even acknowledge the variations among the applicable consumer fraud statutes). Likewise, despite demanding a jury trial,

plaintiffs offer no inkling or guidance as to how the court could possibly charge a jury on the laws of fifty-one different jurisdictions. *See Sanders,* at *11 (noting that where more than a few of the laws of the fifty states differ, the district judge "would face an impossible task of instructing a jury").

Instead, plaintiffs brush off these complexities, urging that New Jersey substantive law should apply simply because defendants' principal place of business is located here. The *Fink* court rejected that very argument, stating "the interests of interstate comity clearly require application of the law of any potential claimant's state of residence because application of any other state's law would frustrate the domiciliary state's legislative policies." *Fink,* 365 N.J. Super. at 585; *see also Karmuth* at *11-12 (rejecting the plaintiffs' contention that Pennsylvania law must apply to all class members simply because the defendant was headquartered there, stating that "putative class members have a due process right to have their claims governed by state law applicable to their dispute"). As the *Fink* court explained:

> Each plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws. These interests arise by virtue of each class member's case before certification. Since the laws of each of the fifty states vary on important issues that are relevant to plaintiffs' causes of action and defendant's defenses, the court cannot conclude that there would be no conflict in applying the law of a single jurisdiction, whether it be Michigan, or New Jersey, as the plaintiffs suggest. Thus, the court will apply the law of each of the states from which plaintiffs hail.

{00489373.DOC}                                        38

*Id.* (*citing In re Ford*, 174 F.R.D. at 348-49).

Plaintiffs' reliance upon *Dal Ponte v. Am. Mortgage Express Corp.*, 2006 U.S. Dist. Lexis 57675 (August 17, 2006 D.N.J.) is misplaced. All class members there shared a common legal claim under federal law and all of the conduct giving rise to the plaintiffs' causes of action occurred in New Jersey: the plaintiffs' mortgage applications were sent from New Jersey, the plaintiffs returned the completed applications to the defendant in New Jersey, the applications were processed within New Jersey, and the defendants' telephone operators were employed in New Jersey and communicated with plaintiffs from their offices in New Jersey. In contrast, the *only* connection plaintiffs here can make to New Jersey is that defendants' principal place of business is located here and it manufactures its products in the State. On the contrary, here the named plaintiffs are all New York residents and never made any of their purchases in New Jersey, nor do their claims bear any other connection to the State. In fact, all four named plaintiffs made their purchases in New York, with the exception of Scher who made some of her purchases in Maryland while at college.

Just as in *Fink*, "[b]ecause of the complexity and management problems which would be confronted by the need to apply the law of conceivably up to 50 states and the need to resolve numerous factual issues generated for individual members of the class depending upon their state of residence, plaintiffs [are]

unable to satisfy the superiority condition for class certification." *Fink*, 365 N.J. Super. at 599. Thus, plaintiffs have failed to satisfy their burden to explain how this Court could manage a class invoking the laws of fifty-one jurisdictions and class certification must be denied.

## III. Plaintiffs Cannot Satisfy Requirements of Rule 23(a).

### A. Commonality

While defendants do not dispute that there may be common issues in this case, such common issues will only arise within the already unmanageable number of the subclasses, and thus will not offer an advantage to class action adjudication. Therefore, defendants refer to the predominance discussion at Point II, *supra*.

### B. Typicality

Typicality requires that "[t]he claims of the representatives must 'have the essential characteristic common to the claim of the class.'" *Fink*, 365 N.J. Super. at 561 (*citing* 3B *Moore's Federal Practice,* para. 23.06-2 (1982)). Here, plaintiffs have failed to demonstrate that their claims are typical of the claims of the class. *Id.* at 566. Their testimony demonstrates that if anything, the named plaintiffs' claims are atypical. For example, the named plaintiffs never purchased two of the five products. Baez testified that she purchased only one of the other three products, once, and disliking the taste, gave the unconsumed portion to her son and never bought it again, while Tosi continued to buy the products even after she

became aware of the alleged mislabeling because she enjoyed the taste so much. Such divergent facts cannot even be reconciled among the named plaintiffs, not to mention an entire class of "tens of thousands" of plaintiffs.

### C.    Numerosity

Defendants do not dispute that, in theory, the proposed class may be sufficiently numerous.  However, defendants disagree with the manner in which plaintiffs define the potential class, *i.e.*, all retail purchasers of the five products from 2000 to the present.  As set forth above, plaintiffs have failed to show that "a substantial number of purchasers were caused to purchase the [products]" as a result of the fat and caloric values listed on the labels or any objective criteria by which members of the proposed class may be ascertained.  *See id.* at 562-63.

### D.    Adequacy of Representation

Plaintiffs' proposed class also fails to satisfy Rule 23(a)(4)'s requirement that the named parties "will fairly and adequately protect the interests of the class." This requirement serves to uncover conflicts of interest between named parties and the class they seek to represent and involves a two-pronged inquiry:  (1) the qualification and competence of plaintiffs' legal representation; and (2) whether plaintiffs' interests are antagonistic to those of the class.  *See General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157-158, n.13 (1982); *Weiss v. York Hosp.*, 745 F.2d 786, 811 (3d Cir. 1984).   Where proposed class counsel exhibits an

{00489373.DOC}                                  41

"overwhelming zeal" to represent the class, courts have viewed this conduct as casting "significant doubts" on the adequacy of the representation, as it could indicate "the appearance of motivation for a large fee." *Rebish v. Great Gorge*, 224 N.J. Super. 619, 625 (App. Div. 1988).

Here, proposed class counsel appears to be the catalyst for the lawsuit, as each of the named plaintiffs became involved in the case only at the suggestion of a relative or friend employed by counsel's law firm. Scher, whose mother is a partner in the same practice group as her counsel, admitted in her deposition that it was not her decision to initiate the lawsuit. (Scher Dep., Ex. 6 to Kang Dec., at 96:19). Likewise, Tosi, Elias and Baez all were referred to Troutman Sanders through friends and/or family employed with the firm. Equally unsettling is Baez's testimony that proposed class counsel assured her, she would never be responsible for the expenses or disbursement incurred in prosecuting this lawsuit. Such an arrangement jeopardizes Baez's ability to adequately represent the interest of those plaintiffs who will be responsible to pay for any expenses or disbursements incurred by Troutman Sanders. (Baez Dep., Ex. 8 to Kang Dec., at 74:12-23).

Moreover, this Court has previously denied class certification where there was an "appearance of impropriety" due to a personal relationship between the proposed class representative and one of the proposed class counsel. *See Schnall v. Amboy Nat'l Bank*, 2002 U.S. Dist. Lexis 17879, at *9 (July 12, 2002) (where

named plaintiff was referred to proposed class counsel's firm by his son, who was an attorney with another firm, the Court found the "appearance of impropriety" precluded certification); *see also Hale v. Citibank, N.A.*, 198 F.R.D. 606, 607 (S.D.N.Y. 2001) (denying class certification due to potential conflict of interest between plaintiff's duties to the class and her husband's contingent financial relationship with class counsel).    Similarly here, the close personal relationships between the proposed class representatives and proposed class counsel interferes with their ability to fairly and adequately represent the class.

Finally, the Amended Complaint expressly excludes any claims for personal injury.  As a result, class members who may claim to have suffered physical injury may later be barred from pursuing those claims by the doctrine of *res judicata. See, e.g., In re Universal Serv. Fund. Tel. Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004).  This potentially prejudicial effect of plaintiffs' claim splitting "is simply too great for the Court to conclude that the named plaintiffs' interest are aligned with those of the class." *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 551 (D. Minn. 1999); *see also Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595, 606 (S.D.N.Y. 1982) (plaintiffs could not adequately represent class where they asserted claims for breach of implied warranty but not personal injury). Therefore, the interests of the named plaintiffs are antagonistic to any class

members with potential personal injury claims allegedly related to the products, and as such, plaintiffs fail to satisfy the second prong of the adequacy requirement.

## **CONCLUSION**

For all of the foregoing reasons, defendants respectfully request that plaintiffs' motion for class certification be denied.

<div style="margin-left: 50%;">

Respectfully submitted,
SAIBER SCHLESINGER SATZ
   & GOLDSTEIN, LLC
Attorneys for Defendants

By:   _/s/ David R. Gross_     
     DAVID R. GROSS

</div>

Dated:  July 6, 2007