TROUTMAN SANDERS LLP
Mark I. Schlesinger
One Gateway Center
Suite 2600
Newark, NJ 07102
(973) 645-0772

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------X

ALEXANDRIA ELIAS, ROXANNE SCHER,
DOLORES BAEZ and JENNIFER TOSI,
on behalf of themselves and all others
similarly situated,

                 Plaintiffs,

    -against-

UNGAR'S FOOD PRODUCTS, INC.,
d/b/a DR. PRAEGER'S SENSIBLE FOODS
and SENSIBLE FOODS LLC d/b/a,
DR. PRAEGER'S SENSIBLE FOODS,

                 Defendants.
-----------------------------------------------------------X

Civil Action No.:
2:06-cv-02448-KSH-PS

**PLAINTIFFS' STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1 IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      Pursuant to Local Civ. Rule 56.1, Plaintiffs submit the following statement of undisputed material facts in opposition to Defendants' motion for summary judgment. Plaintiffs respectfully reserve the right to amend and supplement this Statement as circumstances warrant during further briefing on the motion and the Court's consideration of it.

1. Jeffrey D. Cohen ("Cohen") is the Chief Operating Officer and part owner of Defendant Ungar's Food Products Inc. (hereafter "Ungar's" or the "Company" or, collectively with Sensible Foods LLC, "Defendants"). *See* Certification of Jeffrey D. Cohen, dated August 3, 2010, ¶ 1 (Docket No. 139).

2. Cohen is a Certified Public Accountant and also holds an MBA degree from New York University. *See* Deposition Testimony of Jeffrey D. Cohen, 11:5-12:11, attached as Exhibit 2 to the Declaration of Stephen F. Harmon, Esq.[1]

3. Neither Cohen nor any other employee of the Company at the times relevant to this action had any educational background or training in connection with food manufacturing. *See* Ex. 2, 57:6-9.

4. Cohen has never worked at any other food company other than for the Defendants. *See* Ex. 2, 57:18-58:3.

5. Cohen started working for the Defendants in or about 1997 as the Controller. *See* Ex. 2, 9:19-10:5.

6. Cohen's initial duties involved accounting and record keeping. *See* Ex. 2, 13:7-12.

7. Cohen testified that starting some time in late 2003 he developed his own formula for calculating the nutritional content of the Company's food products for the Nutrition Facts label on the products' packaging using information

---

[1] All Exhibits referred to herein are annexed to the Declaration of Stephen F. Harmon, Esq., dated September 16, 2010, submitted herewith.

2

from databases containing nutritional information for the ingredients, multiplying the quantity of the particular ingredient by the value stated in the nutritional database, summing up the results from all of the ingredients to obtain an average based on the finished product size, and adding to that a factor based on the estimated oil used in the manufacturing process. *See* Ex. 2, 24:6-25:11, 41:7-41:10, and 121:1-122:13.

8. Cohen testified that he could not recall how he arrived at the oil estimate used in his calculations. *See* Ex. 2, 121:1-23.

9. The Defendants have never produced any documentation to demonstrate how the oil estimates were determined.

10. Cohen's calculation formula did not take into consideration the fact that the Company's products were cooked. *See* Ex. 2, 31:24-32:5.

11. Cohen and the Company's other executives knew that oil is not an ingredient that is added to the products, but rather gets into the products through the frying process. *See* Ex. 2, 122:4-124:13.

12. The Company's management knew that the amount of fat in its products is the result of the amount of oil picked up in the frying process but they never discussed the need to know exactly how much fat is in the products so that it could be accurately stated on the nutritional labels. *See* Ex. 2, 122:4-124:13.

13. During the entire time that Cohen was using an oil estimate for his nutritional calculations, the Company never sent any of the products at issue for actual laboratory testing to verify the true fat content of any of its products. *See* Ex. 2, 127:5-9.

14. Cohen's database calculations were not made with any regularity or degree of frequency but rather were performed very infrequently and only as changes were made to the formulation or recipe of any particular product. *See* Ex. 2, 30:8-22. For example the recipe for the California Veggie Burger was not changed from the time the Company first started to manufacture it until August 2001. *See* Final Pretrial Order, Stipulation of Facts ("Undisputed Facts"), ¶ 54 (Docket No. 58). In August 2001, however, the recipe added soy beans and arrowroot. *See* Undisputed Facts, ¶ 55. This recipe remained the same for a year or more when it was changed in September 2002 by eliminating egg whites. *See* Undisputed Facts, ¶ 56. The recipe then remained the same for more than a year until December 2003 when the description of the ingredients changed "Fresh Garlic" to "Garlic." *See* Undisputed Facts, ¶ 57. It is not clear whether this change of description was actually a change of the recipe ingredient. This recipe remained the same for approximately 11 months, when, in November 2004 it was modified to replace soy and soy flakes with textured soy flour, and removed chick peas and added corn starch. *See* Undisputed Facts, ¶ 58. This recipe remained the same for

4

approximately 16 months, until March 2006, after the Company became aware that a competitor, Garden Burger, had the product tested by a laboratory, revealing that its labels substantially misrepresented the fat and caloric content of the product. In March 2006, the Company modified the previous recipe by adding "All Natural Vegetable Gum." *See* Undisputed Facts, ¶ 61.

15. Prior to late 2003, when Cohen began calculating the nutritional information for the products using the formula he developed, the nutritional information that appeared on the Nutrition Facts label of the products was calculated by Dr. Peter Praeger using a book that had nutritional information. *See* Ex. 2, 41:6-21, and Ex. 1, Deposition Testimony of Dr. Peter Praeger, 38:3-40:15.

16. During discovery in this action, Defendants never produced a copy of the book that defendants claim Dr. Peter Praeger used to calculate the nutritional content of the Company's products.

17. During discovery in this matter, Defendants never produced a copy of any calculation performed by Dr. Peter Praeger of the nutritional content of any of the products at issue.

18. Dr. Peter Praeger admitted that his method of calculating the nutritional content of the Company's products, which involved, in part, gauging the amount of oil used in the manufacturing process, was "not scientific" but seemed "more accurate than anything else" because it did not take into

5

consideration oil that hit the floor when the product was "flipped" during the cooking process. *See* Ex. 1, 38:3-40:9.

19. Dr. Peter Praeger did not measure the oil usage on any regular or frequent basis, doing it perhaps every six months or every year. *See* Ex. 1, 99:3-100:19.

20. Dr. Peter Praeger testified that it never occurred to him as a physician that in order to know the actual content of the fat in the products it would be better to have a laboratory test and analyze the products than to simply do a database calculation based upon the recipe of ingredients. *See* Ex. 1, 79:11-80:13.

21. Dr. Peter Praeger was indifferent about the actual amount of fat in the products, testifying that understating the fat content by three grams of good fat was not so drastic; that a few grams more or less of unsaturated fat did not matter because unsaturated fat has no effect on any health hazard. *See* Ex. 1, 94:6-97:2 and 79:11-80:13.

22. It was the Company's general practice to purchase used equipment for use in its manufacturing process. *See* Ex. 2, 45:17-46:1.

23. The Company did not send its products to a laboratory for actual testing because the database calculations were less expensive than actual testing. *See* Ex. 2, 121:1-11 and Ex. 1, 44:13-45:17, 69:8-70:3, and 98:11-100:19.

24. At various times the Company utilized the testing services of QC Laboratories which charged $125.00 for a database calculation. Had the Company done an actual test, the cost would have been $575.00. *See* Ex. 3, Deposition Testimony of Porus Aria, 25:9-21.

25. The Company used the American Heart Association's checkmark on the products at issue in this case in order to imply to the public that the products were heart healthy products. *See* Ex. 1., 85:5-86:18.

26. The Company changed the name on the products from "Ungar's" to "Dr. Praeger's" in order to imply to the public that the products were healthy. *See* Ex. 1, 85:5-86:18.

27. In or about April 2006 the American Heart Association prohibited the Company from using its checkmark on Dr. Praeger's products because the products had a fat content that was in excess of that permitted by the American Heart Association in connection with the use of its heart checkmark. *See* Ex. 14.

28. After the American Heart Association prohibited the Company from using its heart checkmark, the Company put a heart logo on Dr. Praeger's products because it understood that it could do so without paying the American Heart Association a fee and in order to convey to the buying public that the products were heart healthy. *See* Ex. 1, 87:1-89:3.

29. In or about January 2006 Garden Burger, a competitor of the Company, had an actual laboratory analysis done by Michelson Laboratories ("Michelson") on the nutritional content of the California Veggie Burger. *See* Ex. 1, 89:13-91:24, Ex. 2, 154:8-22, and Ex. 5.

30. The Michelson test on the California Veggie Burger showed that the Company had significantly understated on its packaging the caloric and fat content of the product. Whereas the packaging stated that the product had 110 calories, the Michelson test showed that that the product had 171.2 calories. Whereas the Company's packaging showed that the fat content was 4 grams, the Michelson report showed that the fat content was 7.49 grams. *See* Ex. 5 and Undisputed Facts, ¶ 59.

31. Garden Burger sent the Company a copy of the Michelson report together with a chart comparing the nutritional content represented on the Company's packaging for its California Veggie Burger and the nutritional content disclosed as a result of the actual testing performed by the Michelson. *See* Ex. 1, 89:14-93:9 and Ex. 5.

32. When the Company received the Michelson report, it did not give Michelson its formula for the veggie burger or tell Michelson that a database calculation would show that Michelson's test was wrong. Instead, the Company's

management said that maybe its product was mislabeled and that they should send it out for actual testing to see if they were right or wrong. *See* Ex. 1, 93:10-98:2.

33.  Upon receipt of the Michelson report, Dr. Eric Somberg, one of the owners of the Company, told the Company's other executives that the Company should hire "a food scientist who will show us how to fix this and the proper way to do it." *See* Ex. 1, 93:10-94:15.

34.  After receiving the Michelson report, the Company sent its products to QC Laboratories ("QC") for testing in February 2006. The tests performed by QC also showed that the nutritional labels significantly understated the fat and caloric content of the products. *See* Ex. 6.

35.  QC's tests revealed that the 107 gram sized California Veggie Burger contained 8.21 grams of fat and 173.63 calories per serving, whereas the label stated that it contained 4 grams of fat and 110 calories per serving. *See* Ex. 6 and Undisputed Facts, ¶ 59.

36.  QC's tests revealed that the Broccoli Pancakes contained 3.36 grams of fat and 57.63 calories per serving, whereas the label stated that it contained 2 grams of fat and 40 calories per serving. *See* Ex. 6 and Undisputed Facts, ¶ 43.

37.  QC's tests revealed that the Tex-Mex Veggie Burgers contained 7.16 grams of fat and 140.32 calories per serving, whereas the label stated that it

contained 3.5 grams of fat and 100 calories per serving. *See* Ex. 6 and Undisputed Facts, ¶¶ 69 and 70.

38. QC's tests revealed that the Spinach Pancakes contained 3.52 grams of fat and 61.82 calories per serving, whereas the label stated that it contained 2 grams of fat and 40 calories per serving. *See* Ex. 6 and Undisputed Facts, ¶ 49.

39. QC's tests revealed that the Potato Pancakes contained 5.18 grams of fat and 79.78 calories per serving, whereas the label stated that it contained 2 grams of fat and 50 calories per serving. *See* Ex. 6 and Undisputed Facts, ¶ 76.

40. Certain of the Company's products were sent by the attorneys for the plaintiffs in this case to ABC Research Corp. ("ABC") for actual laboratory testing of the nutritional content of those products. Those tests showed that the nutritional facts label on the products' packaging significantly understated the fat and caloric content of the products. *See* Ex. 7

41. ABC's tests revealed that the California Veggie Burger contained 8.9 grams of fat and 158 calories per serving, whereas the label stated that it contained significantly lower amounts. *See* Ex. 7 and Undisputed Facts, ¶¶ 54-58 and 60-63.

42. ABC's tests revealed that the Broccoli Pancakes contained 3.8 grams of fat and 61 calories per serving, whereas the label stated that it contained 2 grams of fat and 40 calories per serving. *See* Ex. 7 and Undisputed Facts, ¶ 43.

43. ABC's tests revealed that the Potato Pancakes contained 4.8 grams of fat and 79 calories per serving, whereas the label stated that it contained significantly lower amounts. *See* Ex. 7 and Undisputed Facts, ¶¶ 74-76.

44. The Company also sent certain of its products here at issue to Sani-Pure Food Laboratories ("Sani-Pure") for actual testing in March and April 2006. Those tests also showed that the Company had significantly understated the fat and caloric content of the products on its packaging. *See* Ex. 8.

45. Sani-Pure's tests revealed that the 107 gram sized California Veggie Burger contained 9.3 grams of fat and 182.94 calories per serving, whereas the label stated that it contained 4 grams of fat and 110 calories per serving. *See* Ex. 8 and Undisputed Facts, ¶ 59.

46. Sani-Pure's tests revealed that the 78 gram sized California Veggie Burger contained 7.57 grams of fat and 146.82 calories per serving, whereas the label stated that it contained significantly lower amounts. *See* Ex. 8 and Undisputed Facts, ¶¶ 54-58 and 60-63.

47. Sani-Pure's tests revealed that the Spinach Pancakes contained 4.32 grams of fat, whereas the label stated that it contained 2 grams of fat. *See* Ex. 8 and Undisputed Facts, ¶ 49.

48. After receiving the reports from Michelson, QC, and Sani-Pure, the Company worked for many months to reformulate its products in an effort to create

products that had the lowest amount of calories and fat, but it never went back to any of the formulas it had previously used and claims in this case were versions of its products that were sold with labels containing accurate fat and caloric content. *See* Certification of Jeffrey Cohen, ¶ 5. Moreover, the reformulated products never had a calorie or fat content as low as had previously been represented on the Company's packaging prior to the reformulation. Compare ¶ 43 and ¶ 45 of the Undisputed Facts (Broccoli Pancakes); Compare ¶ 50 and ¶ 53 of the Undisputed Facts (Spinach Pancakes); Compare ¶ 60 and ¶ 61 of the Undisputed Facts (78 gram sized California Veggie Burgers); Compare ¶ 59 and ¶ 65 of the Undisputed Facts (club size California Veggie Burgers); Compare ¶ 70 and ¶ 71 of the Undisputed Facts (Tex-Mex Veggie Burgers); and Compare ¶ 76 and ¶ 78 of the Undisputed Facts (Potato Pancakes).

49. Following the laboratory tests of the products in early 2006, Defendants commenced a recall of the Veggie Burgers under the auspices of the Food & Drug Administration, as well as stopping the sales of other products at issue in this case. *See* Cohen Cert. at ¶ 5 and Ex. 1, 182:8-184:20.

50. Dr. Porus Aria of QC Laboratories informed Defendants that actual testing should be done because the Products were cooked foods. Dr. Aria testified that his laboratory did not typically encourage its clients to conduct database calculations based on a recipe, as Defendants did prior to 2006, because products

that are cooked and fried can pick up fat and such calculations may not reflect the "real world." *See* Ex. 3, 19:17-24:7 and Ex. 10.

51. Defendants persisted in failing to conduct independent laboratory testing of the products, despite receiving a recommendation from FDA inspectors that such tests should be utilized. *See* Ex. 2, 104:14-105:7.

52. The expert report of Joe M. Regenstein, Professor of Food Science at Cornell University (the "Regenstein Report"), states that Defendants' database calculations are not appropriate for their products at issue, which are a fried food, because of the fat picked up and the moisture lost during frying. *See* Ex. 11, p. 2.

53. The Regenstein Report states that: "The nutritional labeling of the products in question systematically and substantially underestimated both fat and calorie content over a number of years because the processes for determining fat and calories, as described in the deposition testimony of Jeff Cohen and Peter Praeger, M.D. were invalid and inconsistent with the results of laboratory testing. These products were seriously out of compliance even with the 20% leeway provided by the Nutritional Labeling and Education Act regulations." *See* Ex. 11, p. 1.

54. The Regenstein Report states that "The serious discrepancies between the products' nutritional labeling and the results of the laboratory testing are

attributable to the fact that these Dr. Praeger's products are not raw; they are fried during their manufacture." *See* Ex. 11, p. 2.

55. The Regenstein Report states that "It is very clear to me that the company made no serious effort prior to 2006 to obtain an accurate value for these important parameters, that is, lipid (fat) and moisture content." *See* Ex. 11, p. 2.

56. The Regenstein Report states that the methodology that Jeffrey Cohen testified he used to determine the products' fat content was based on "the false assumption that all products will absorb oil at the same rate." *See* Ex. 11, p. 2.

57. Defendants prepared a letter to Costco Buyers apologizing for "elevated nutritional" in the California Veggie Burger. *See* Ex. 12.

58. Defendants sent a letter to customers in conjunction with the recall of California Veggie Burgers and Tex-Mex Veggie Burgers, announcing that they were "removing all product with inaccurate information and replacing it with correctly labeled product." *See* Ex. 9.

59. Jeffrey Cohen admitted that "some of our product may have been mislabeled" *See* Ex. 2, 154:8-22.

60. Dr. Praeger admitted that "I believe there was an error made on the box…" *See* Ex. 1, 164:5-16.

61. In a letter to Costco, one of their key customers, Defendants admitted that Products were mislabeled. *See* Ex. 13.

62. Dr. Praeger testified that Defendants responded to the public discovery in 2006 that the Veggie Burgers were mislabeled by telling customers that all of the Products could be returned, stating that, "If you want to send it back to us you can send it back because we are making all new boxes. We decided at this point that we are going to test everything, send it to the laboratory whether it's good or not good" and that "Now we are going to become a company that does it the way you are supposed to do it." *See* Ex. 1, 182:11-184:20.

63. Defendants acquired at least $ redacted in revenue from the sales of the mislabeled products at issue in this case. *See* Ex. 4.

64. Defendants have manufactured and sold the Products since approximately 1995. *See* Ex. 1, 40:19-42:8.

Dated: Newark, New Jersey
September 16, 2010

        TROUTMAN SANDERS LLP

        By: /s/ Mark I. Schlesinger
           Mark I. Schlesinger
           -and-
           Stephen F. Harmon
           Charles P. Greenman
           Matthew J. Aaronson
           Eric L. Unis
           405 Lexington Avenue
           New York, New York 10174
           *Attorneys for Plaintiffs*